UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DARRYL SWAIN,

                              Plaintiff          DECISION AND ORDER

-vs-
                                                 17-CV-6110 CJS
COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____


APPEARANCES

For the Plaintiff:          Stephen R. Ruotsi, Esq.
                            Kenneth R. Hiller, Esq.
                            Law Offices of Kenneth Hiller
                            60000 North Bailey Avenue, Suite 1A
                            Amherst, New York 14226

For the Defendant:          Graham Morrison, Esq.
                            Social Security Administration
                            Office of General Counsel
                            26 Federal Plaza, Room 3904
                            New York, New York 10278

                            Kathryn L. Smith, A.U.S.A.
                            Office of the United States Attorney
                            for the Western District of New York
                            100 State Street
                            Rochester, New York 14614

INTRODUCTION

     This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Darryl Swain ("Plaintiff") for Supplemental Security

Income Benefits ("SSI").  Now before the Court is Plaintiff's motion (Docket No. [#11]) for

judgment on the pleadings and Defendant's cross-motion [#13] for judgment on the pleadings.  Plaintiff's application is granted in part, Defendant's application is denied, and this matter is remanded for further administrative proceedings.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the parties' submissions, which contain detailed recitations of the pertinent facts.  The Administrative Record is exceptionally lengthy, comprising 939 pages.  This is due to the fact that this action dates back to April 7, 2009, when Plaintiff first applied for SSI benefits.

For purposes of resolving the pending applications, it is sufficient to note the following facts.  Plaintiff, who was born in 1966, applied for SSI benefits, claiming to have become disabled on December 15, 2007. (T. 13).[1]  Although, even prior to the alleged onset date Plaintiff has barely any reported earnings or work history.  In that regard, Plaintiff reportedly described his work history as follows:  "He has worked off and on over the years detailing cars, installing grass and washing windows." (T. 906).  Plaintiff claimed to be disabled primarily due to lower back pain, ankle pain, tumors in his back, and a limited ability to read and write. (T. 15).

On August 4, 2010, a hearing was held before an Administrative Law Judge ("ALJ"), at which Plaintiff appeared with an attorney representative.  Plaintiff's attorney requested a consultative mental examination. (T. 181, 299).  When the ALJ asked why such an examination was necessary, the attorney indicated that Plaintiff had only a ninth-grade education, and was unable to read or perform math at an "appropriate level." (T. 299).  When the ALJ asked the attorney whether he had attempted to obtain Plaintiff's

_____

[1]Unless otherwise indicated, citations are to the Administrative Record, Docket No. [#9].

school records, the attorney stated that he had requested Plaintiff's records from the Rochester City School District, but that such records had been destroyed. (T. 299-300). Curiously, Plaintiff, who was present during this discussion, did not inform his attorney or the ALJ that he had attended school in Alabama, not Rochester.  (T. 189-192, 300).  In any event, the ALJ denied the request for a consultative mental examination, but agreed to leave the record open for two weeks following the hearing, to allow Plaintiff to submit any additional school records that could be located.  Plaintiff did not submit any additional evidence within that period.  During the hearing, Plaintiff testified, in pertinent part, that a typical day involved him waking up at around 6 a.m.; socializing with his father-in-law; going back to bed around 11 a.m. because "[he] really d[id]'t have anything to do"; socializing with family until about 7 or 8 p.m.; and then going to bed. (T. 309-310).

On August 19, 2010, the ALJ issued a Decision, denying Plaintiff's claim for SSI benefits.  As part of the ruling, the ALJ found, at the third step of the familiar five-step sequential analysis used to evaluate such claims,[2] that Plaintiff's mental impairments did not meet or equal Listing 12.05(c), "mental retardation." (T. 18).  On this point, the ALJ stated in pertinent part:

---

[2]"A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.  First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in ... the regulations.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.  The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five." *Colvin v. Berryhill*, No. 17-1438-CV, --- Fed. Appx. --- , 2018 WL 2277791, at *1 (2d Cir. May 18, 2018) (citations and internal quotation marks omitted).

> The 'paragraph C' criteria of Listing 12.05 are not indicated as there is no
> evidence of deficits of adaptive functioning before age 22 (the claim
> appears to have also good adaptive functioning currently), nor the
> intellectual test scores required for the criteria of Listing 12.05.

(T. 18). The ALJ further noted that Plaintiff had no more than mild restrictions in his daily

activities, and stated: "The claimant's testimony at the hearing did not indicate limitations

one would expect from a person alleging serious mental deficits and debilitating mental

functioning." (T. 17). Prior to reaching step four of the sequential analysis, the ALJ found

that Plaintiff had the residual functional capacity ("RFC")

> to lift/carry 20 pounds occasionally and 10 pounds frequently. He can sit 6
> of 8 hours and stand and walk 6 of 8 hours. He must avoid concentrated
> exposure to the hazards of work involving hazardous moving machinery
> and unprotected heights. He cannot perform commercial driving. [Plaintiff
> does not have a driver's license due to owing child support.] The claimant
> is limited to unskilled simple work involving one to two step tasks.

(T. 18). In making this determination, the ALJ stated that she did not find Plaintiff to be

credible:

> [T]he undersigned has found his credibility as a witness to be poor and his
> demeanor during the hearing consistent with the limitations established in
> [the RFC finding].
>
> The evidence does not indicate that the claimant is disabled. There is no
> objective evidence that a medical provider has stated that he is disabled or
> assigned him any work limitations. His treatment consists of conservative
> care with routine medication management, with most of his conditions listed
> as stable or controlled. His activities of daily living are very active, to his
> credit working when he has jobs and visiting with family and grandchildren.
> He participated in outpatient alcohol treatment for two to four days a week.
> There is no evidence of any of the mental problems that the claimant
> alleges.

4

(T. 20). At step five of the sequential analysis, the ALJ concluded that Plaintiff was not disabled because he could perform specific light and sedentary jobs. (T. 23-24).

Shortly after the ALJ's decision was issued, Plaintiff's counsel obtained four pages of school records (from Alabama), including IQ test results. (T. 189-192). The records indicate that Plaintiff generally received poor grades, and that IQ testing, performed in 1973 and 1975, showed scores of 73 and 72, respectively. (T. 189-190). Plaintiff submitted the school records to the Appeals Council. However, the Appeals Council declined to review the ALJ's determination.

Plaintiff eventually commenced an action in this Court, *Swain v. Astrue*, Docket No. 12-CV-6233P, which upon consent of the parties was assigned to the Honorable Marian W. Payson, United States Magistrate Judge. On March 31, 2014, Judge Payson issued a Decision and Order, reversing the Commissioner's decision and remanding the case to the Commissioner. Preliminarily, Judge Payson noted that Plaintiff was only challenging the Commissioner's determination insofar as it pertained to his alleged mental impairments. Payson Dec. & Order at p. 10 ("Petitioner does not contest the Commissioner's findings regarding [his] physical impairments or his anxiety around crowds and strangers. Petitioner only contests the Commissioner's findings relating to Petitioner's intellectual limitations."). Accordingly, Judge Payson stated that she accepted the Commissioner's determinations regarding Plaintiff's physical impairments and his alleged anxiety around crowds, and would only "focus[ ] on petitioner's intellectual impairments." *Id.* at p. 13.

With regard to such intellectual impairments, Judge Payson observed that Plaintiff was maintaining that the ALJ had erred by denying his request for intelligence testing; by

making a mental RFC determination that was not supported by substantial evidence; and by improperly finding that he was not credible. However, Judge Payson found, instead, and *sua sponte*, that "the fundamental error with the Commissioner's determination stem[med] from the failure of the Appeals Council to conduct a review of the ALJ's decision in light of the new evidence that petitioner submitted – specifically his school records." Payson Decision and Order at p. 14; *see also id*. at p. 15 ("I conclude that there is a reasonable possibility that the school records [obtained post-hearing and submitted to the Appeals Council] would have affected the ALJ's decision.").

In particular, Judge Payson found that the school records could have affected the ALJ's analysis, at step three, of whether Plaintiff met the requirements of Listing 12.05(C). On this point, Judge Payson stated:

> To meet the requirements of Listing 12.05(C) a claimant must demonstrate the following: (1) deficits in adaptive functioning initially manifested . . . before age 22; (2) [a] valid verbal, performance, or full scale IQ of 60 through 70; and, (3) a physical or other mental impairment imposing an additional significant work-related limitation of function. 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 12.05;

Payson Decision and Order at p. 16. Judge Payson noted that the school records were relevant because they "are evidence that [Plaintiff] suffered a deficit prior to the age of twenty-two," and because the IQ scores, while "slightly outside the permissible range," could provide a basis to find "equivalency to Listing 12.05(C)." *Id*. at p. 17. Judge Payson further observed that the ALJ had already found that Plaintiff had other physical impairments that imposed significant work-related limitations of function. *Id*. Judge Payson added, "Accordingly, all that would be left for petitioner to meet Listing 12.05(C) is a valid IQ score between 60 and 70." *Id*. at p. 18. Judge Payson further indicated that

6

new IQ testing would be required, because the IQ test results from 1973 and 1975 were "too stale to establish that petitioner has met the second prong of the listing." *Id*. In conclusion, Judge Payson stated:

> [A] review of the record before the Court, which now includes petitioner's school records, does not permit a conclusion that substantial evidence supports a finding that petitioner does not meet the requirements of Listing 12.05(c).
>
> ***
>
> I conclude that a remand pursuant to sentence four of 42 U.S.C. § 405(g) is appropriate. **On remand, the Commissioner should obtain valid IQ scores for petitioner and obtain a consultative psychological evaluation to assess petitioner's mental capabilities.**

*Id*. at p. 21 (emphasis added). In response to Judge Payson's ruling, the Appeals Council issued an order remanding the "case to an Administrative Law Judge for further proceedings consistent with the order of the court." (T. 401).

On remand, the Commissioner obtained IQ testing and a psychological evaluation, both from consultative examiner Christine Ransom, Ph.D. ("Ransom"). The IQ testing indicated, *inter alia*, that Plaintiff had a full scale IQ score of 68. (T. 903). However, the psychological evaluation concluded that despite Plaintiff's IQ score, he had no significant problems with adaptive functioning, and "no [psychological] disorder." (T. 908). For example, the evaluation made the following observations about Plaintiff: he "denied generalized anxiety, panic attacks, manic symptomology, thought disorder cognitive symptoms and deficits other than a learning disability" (T. 906); his speech was "fluent and intelligible" (T. 907); his thought processes were "coherent and goal-directed with no evidence of hallucinations, delusions or paranoia" (T. 907); his affect was "full" and "appropriate" (T. 907); his memory, attention and concentration were "intact" (T. 907); his

7

intellectual functioning was "mildly deficient" and his general fund of information was "in the borderline range" (T. 908); and his "current adaptive functioning" was "in the low average range." (T. 908). In pertinent part, Ransom's psychiatric evaluation report stated:

> Intellectual functioning was found to be in the mildly deficient range with a Full Scale IQ score of 68. General fund of information was found to be in the borderline range.
>
> ***
>
> Adaptive functioning appears to be in the low average range.
>
> ***
>
> This individual will show no evidence of limitation following and understanding simple directions and instructions, perform[ing] simple tasks independently, maintain[ing] attention and concentration for simple tasks, maintain[ing] a simple regular schedule and learn[ing] simple new tasks, perform[ing] complex tasks, relat[ing] adequately with others and appropriately deal[ing] with stress.
>
> The results of the evaluation are consistent with the absence of a cognitive deficit. Even though cognitive functioning is in the mildly deficient range[,] adaptive functioning appears to be in the low average range. There is no evidence of a psychiatric condition which would interfere with the claimant's ability to function on a daily basis.
>
> DIAGNOSIS[:] No disorder.

(T. 908). Ransom reported that Plaintiff claimed to have difficulty managing money, but otherwise, she noted that Plaintiff was able to handle all of the normal activities of daily living, and that he spent his time watching television and socializing with family members, including grandchildren. (T. 908).[3]

---

[3]During the psychological exam, Plaintiff reportedly denied any "drug history" (T. 906), however, the medical records indicate both that he has tested positive for having used cocaine and marijuana, and that he admitted to using crack cocaine during his younger years.

On May 7, 2015, a hearing was conducted before a new ALJ. At the start of the hearing, the ALJ and Plaintiff's attorney discussed the scope of the hearing, in light of Judge Payson's remand order. The ALJ and Counsel agreed that the purpose of the remand was to consider Plaintiff's mental limitations, not his physical limitations. (T. 345).[4] In particular, Plaintiff's counsel indicated that the issues to be considered at the hearing were Plaintiff's IQ and his adaptive functioning. (T. 345-346). Plaintiff's counsel asserted that the full-scale IQ testing score of 68 established the requirement, under Listing 12.05(C), for an IQ score of between 60 and 70. As for the psychological testing, Plaintiff's counsel indicated that she disagreed with Ransom's findings concerning adaptive functioning. (T. 345-346) ("Dr. Ransom . . . made a [finding] that the adaptive functioning in her estimation appeared to be in the low average range, and so therefore, she did not find any cognitive deficits. I would have to disagree with that finding from Dr. Ransom.").

As evidence that Plaintiff actually had more serious deficits in adaptive functioning than Ransom found, Plaintiff's counsel elicited testimony from him that he could barely read; that he had difficulty counting change when shopping at a store; that he had difficulty telling time from an analog clock; that he frequently argued with people, including his wife; and that his wife helped him with his shopping because she is more savvy at finding bargains. When asked about his daily activities, Plaintiff indicated, apparently to his counsel's surprise, that he essentially provides daycare for his three

---

[4]As part of this discussion, the ALJ and Plaintiff's counsel discussed the fact, addressed further below, that Plaintiff's primary care physician, Dr. Guo, executed conflicting physical RFC reports. Plaintiff's counsel acknowledged that Guo's reports were inconsistent, and indicated that she had decided not to seek clarification from Dr. Guo, since the purpose of the remand was only to consider Plaintiff's mental functioning. (T. 344-345).

grandchildren, ages 3, 7, and 12, on a daily basis. (T. 368-369). For example, Plaintiff

indicated that he picks up the seven-year-old grandchild at his daughter's home each

morning, walks him to the bus at 8 a.m., and then returns to pick him up at 11 a.m. (T.

369); that while the older child is at school, he takes the three-year-old grandchild to the

park to play (T. 369); and that at 3:30 p.m., he picks up the twelve-year-old from the

school bus, and watches all three children until their mother returns home from work. (T.

369).

On June 23, 2015, the ALJ issued a Decision finding that Plaintiff was not

disabled. (T. 280-289). The ALJ noted, preliminarily, the procedural history of the case,

and accurately observed: "Pursuant to the District Court remand order, the Appeals

Council has directed me to obtain valid IQ scores and a consultative psychological

evaluation to assess the claimant's mental capabilities." (T. 280, 902-909). Regarding

the testing that had been performed by Ransom, the ALJ stated, in pertinent part:

> [A]n intellectual evaluation was performed in February 2014[.] . . . The
> claimant readily recalled, understood and responded to instructions. His
> scores on the WAIS-IV were 68 Full Scale, 70 Verbal, Perceptual
> Reasoning 71, Working Memory 74, and Processing Speed 70. The
> WRAT-IV reading achievement score placed his ability at the second grade
> level, which is in the mildly deficient range. However, the claimant reported
> he could dress, bathe, groom, prepare food, cook, clean, do laundry, take
> public transportation, and socialize with family and grandchildren daily. The
> consultative examiner, Dr. Ransom, states that based on the claimant's
> report his adaptive functioning is in the low average range. She concludes
> there is no cognitive disorder and no evidence of a psychiatric condition
> which would interfere with the claimant's abilities to function on a daily
> basis. There is no other diagnosis in the file pertaining to his cognitive
> abilities.
>                                  ***
> [During Dr. Ransom's examination,] claimant reported no mental health

treatment or medication but a history of special education. During the testing, the claimant was noted to readily recall and understand instructions and had adequate attention and concentration. . . . Dr. Ransom concluded the claimant had no disorder because even though cognitive functioning was in the mildly deficient range, adaptive functioning was in the low average range. Some weight is accorded to the opinion of Dr. Ransom because her opinion is based in part on objective test results. However, I find the claimant's low average adaptive functioning does cause some limitations and [would restrict Plaintiff] to simple work.

(T. 284, 287).

The ALJ conducted the five-step sequential analysis. At the third step of that analysis, the ALJ found that Plaintiff did not meet any listing for a mental impairment, stating:

The claimant's mental impairment has been considered under the requirements of listing 12.05 and 12.06. Mental deficiency refers to significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in paragraphs A, B, C, or D are satisfied.

The requirements in paragraph A are met when there is mental incapacity evidenced by depending upon others for personal needs . . . . In this case, these requirements are not met because the claimant is independent in her [sic] personal needs, including dressing, bathing, grooming, preparing meals, and doing laundry.

Turning to the requirements in paragraph B, they are not met because the claimant does not have a valid verbal, performance or full scale IQ of 59 or less. There is no evidence of an IQ in this score range.

In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Finally, the requirements in paragraph D are met if the claimant has a valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.

\*\*\*

For both paragraph C and D, the claimant has a history of poor school performance and a reference to the Otis-Lennon test in 1973 that revealed an IQ score of 73 and a WISC in 1975 that had an IQ score of 72.  Both scores are above the requisite listing requirements.

The claimant never reported any adaptive functioning or cognitive problems to his providers but an intellectual evaluation was performed in February 2014 at the request of the State agency.  It is also noted that the claimant never alleged any mental or cognitive impairments until the time of his first hearing.  His medical records specifically state there is no special needs related to learning.  The claimant's speech and language skills were found to be in the borderline range.  The claimant readily recalled, understood and responded to instructions.  His scores on the WAIS-IV were 68 full scale, 70 verbal, Perceptual reasoning 71, Working memory 74, and processing speed 70.  The WRAT-IV reading achievement score placed his ability at the second grade level, which is in the mildly deficient range.  However, the claimant reported he could dress, bathe, groom, prepare food, cook, clean, do laundry, take public transportation, and socialize with family and grandchildren daily.  The consultative examiner, Dr. Ransom, states that based on the claimant's report his adaptive functioning is in the low average range.  She concludes there is no cognitive disorder and no evidence of a psychiatric condition which would interfere with the claimant's abilities to function on a daily basis.  There is no other diagnosis in the file pertaining to his cognitive abilities.

In activities of daily living, the claimant has mild restriction.  The claimant is able to bathe, dress, and groom himself.  He can prepare meals and do housework.  He also testified he will work odd jobs as he finds them.

In social functioning, the claimant has mild difficulties.  The claimant reports he does not like being around crowds of three to four people and he stays away from strangers.  The claimant testified he is currently living apart from his wife but that they still meet up to go shopping and he eats at her house frequently.  The claimant also sees his grandchildren daily and helps with homework if able.  He is also able to sued public transportation and states he will ask for help if needed.

With regard to concentration, persistence or pace, the claimant has moderate difficulties.  The claimant states he is a slow learner and will be easily frustrated.  The claimant testified he is responsible for getting two of his grandchildren to and from school but has trouble with helping them in homework.  He has trouble making change and requires help when 'stretching' his food stamps at the grocery store.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

Accordingly, the requirements in paragraph D are not satisfied.

(T. 283-284).

Prior to reaching step four of the sequential analysis, the ALJ found, as part of his RFC determination, that Plaintiff's mental impairments limited him to "unskilled, simple work involving one to two step tasks." (T. 285).  At step four, the ALJ found that Plaintiff had no past relevant work. (T. 288).  At step five, the ALJ concluded that Plaintiff was not disabled, because despite his limitations there were jobs existing in significant numbers in the national economy that he could perform. (T. 288).  Plaintiff appealed, but on December 27, 2016, the Appeals Council declined to review the ALJ's determination. (T. 263-265).

On February 21, 2017, Plaintiff commenced this action. On October 6, 2017, Plaintiff filed the subject motion [#11] for judgment on the pleadings. Plaintiff asserts two grounds for his motion. First, he contends that the ALJ failed to follow the remand instructions of Judge Payson and the Appeals Council. In that regard, Plaintiff argues that Judge Payson essentially remanded the action for one reason, namely, to obtain IQ testing. According to Plaintiff, Judge Payson determined that he met two of the three requirements of Listing 12.05(C), and that all he needed to meet the remaining requirement was to produce an IQ score between 60 and 70, which he did. Plaintiff maintains that Judge Payson's ruling on this point is "law of the case," and that he therefore must be found disabled.

Second, Plaintiff contends that the ALJ failed to follow the "treating physician rule" when he evaluated RFC reports submitted by his treating physician, Dr. Guo ("Guo"). In that regard, Guo treated Plaintiff for essentially a year, between 2013 and 2014. (T. 286). Plaintiff's decision to begin treating with Guo seems to have coincided with the fact that his previous physician, Dr. Atalla, refused to continue prescribing narcotic pain killers to Plaintiff, after Plaintiff tested positive for using cocaine and marijuana. (T. 654, 656, 670). Dr. Guo began prescribing Plaintiff the narcotic painkillers Norco and Hydrocodone.[5]

In any event, Guo completed three different reports concerning Plaintiff's ability to work: A "Physical Assessment for Determination of Employability" for the Monroe County Department of Social Services, dated August 6, 2014 (T. 670-673); a second "Physical Assessment for Determination of Employability" for the Monroe County Department of

---

[5]Indeed, most of the records obtained from Dr. Guo's office pertain to Plaintiff's requests for refills of his hydrocodone prescription. (T. 672, 554-555, 560-561, 563, 566-567; 570 "[W]as more interested in getting his hydrocodone . . . He is still concerned about getting his hydrocodone.").

Social Services, dated December 2, 2014 (T. 674-677); and a "Physical Residual Functional Capacity Questionnaire," on a form provided by Plaintiff's attorney, dated December 18, 2014. (679-683). Suffice it to say that although the three reports were completed within four months of each other, the forms completed for Monroe County expressed opinions that were significantly different than those expressed in the form provided to Plaintiff's attorney. For example, the forms provided to Monroe County indicated that Plaintiff's inability to work was expected to last six months, that he could lift up to 15 pounds, and that in an 8-hour workday he could walk "2-4 hours," stand "2-4 hours," and sit "more than 4 hours." (T. 671, 673, 675, 677). However, the form provided to Plaintiff's attorney indicated that Plaintiff could only occasionally lift "less than 10 lbs.," that he could "stand/walk" "less than 2 hours" in a workday, and that he could sit only "about 4 hours" in a workday. (T. 681). Further, Guo's report to Plaintiff's attorney indicated that Plaintiff would need to take at least two unscheduled breaks, lasting fifteen minutes each, twice per day, and that he would likely miss about two days per month from work. (T. 681-682). Because of the discrepancies between the reports, the ALJ indicated that he gave only "little weight" to the reports. (T. 287). In doing so, Plaintiff contends, the ALJ failed to properly apply the treating physician rule, because he failed to give a sufficient explanation for the weight that he assigned to Guo's report.

On December 4, 2017, Defendant filed the subject cross-motion [#13] for judgment on the pleadings. Defendant's motion argues, first, that the ALJ "properly assessed Plaintiff's mental limitations under [Listing] 12.05."[6] In this regard, Defendant's argument is almost exclusively focused on the absence of current deficits in adaptive

_____

[6]Def. Memo of Law [#13-1] at p. 15.

15

functioning, as indicated by Ransom's evaluation report, and on the alleged absence of evidence of such deficits prior to age 22. As for Plaintiff's recent full scale IQ score of 68, Defendant states, "Although Plaintiff's full-scale IQ score was 68, the ALJ properly determined it did not interfere with Plaintiff's ability to function on a daily basis."[7] On this point, Defendant's counsel argues that an "ALJ may reject and IQ score as invalid when it is inconsistent with the record," citing *Burnette v. Colvin*, 564 F.App'x 605, 607-608 (2d Cir. Apr. 30, 2014).[8] Defendant further contends that the ALJ properly assessed Plaintiff's physical RFC, and that he properly gave little weight to Dr. Guo's reports, which were inconsistent with each other and with Guo's treatment notes.

On December 26, 2017, Plaintiff filed a reply [#14], which reiterates his two arguments discussed earlier. With regard to Listing 12.05(C), Plaintiff contends that he has demonstrated adaptive deficits prior to age 22, with evidence that he was in special education classes, received poor grades and did not graduate. Plaintiff also maintains that his poor work history is indicative of adaptive deficits. Plaintiff further contends that Defendant defaulted in responding to his argument that the ALJ failed to comply with Judge Payson's remand order. That is, Plaintiff reiterates that on remand, the ALJ was only supposed to obtain an IQ score and determine whether such score met the requirement of Listing 12.05(C). Further, Plaintiff reiterates his argument that the ALJ failed to properly evaluate Dr. Guo's opinion evidence.

On May 24, 2018, counsel for the parties appeared for oral argument, with Defendant's counsel appearing by telephone with the Court's permission. During oral

---

[7]Def. Memo of Law [#13-1] at pp. 16-17.

[8]Def. Memo of Law [#13-1] at p. 17.

16

argument, Defendant's counsel agreed with Plaintiff's contention that Judge Payson had remanded the action only for the ALJ to make a finding as to whether Plaintiff's IQ was between 60 and 70. Further, Defendant's counsel agreed that Plaintiff's IQ scores from 1973 and 1975 were stale. Defendant's counsel nevertheless indicated that Plaintiff's IQ score results, as found by Ransom, were "borderline," and that the ALJ therefore properly found that Plaintiff did not meet Listing 12.05(C).

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

In appropriate cases, a court may remand an action to the Commissioner for further proceedings, including for a "clearer explanation for the decision":

> The Social Security Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings. As expressly stated: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *Butts[ v. Barnhart*], 388 F.3d [377,] 382 [(2d Cir. 2004)]. If " 'there are gaps in the administrative record or the ALJ has applied an improper legal standard,' " the court will remand the case for further development of the evidence or for more specific findings. *Rosa [v. Callahan,]* 168 F.3d [72,] 82–83 [(2d Cir. 1999)] (*quoting Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir.1996)). Remand is particularly appropriate where

17

further findings or explanation will clarify the rationale for the ALJ's decision. *Pratts*, 94 F.3d at 39 [("Remand is particularly appropriate where, as here, we are unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision.") (citation and internal quotation marks omitted)].

*Grace v. Astrue*, No. 11 CIV. 9162 ALC MHD, 2013 WL 4010271, at *14 (S.D.N.Y. July 31, 2013).

DISCUSSION

Plaintiff's motion presents two issues:  First, whether the ALJ properly followed Judge Payson's remand order; and second, whether the ALJ properly evaluated the opinion evidence submitted by Dr. Guo, concerning Plaintiff's physical impairments.

With regard to the second issue, the Court finds that Plaintiff's argument lacks merit.  To begin with, such argument is irreconcilable with Plaintiff's primary argument, which is that Judge Payson remanded the action solely for a determination of his IQ score.  As will be discussed below, the Court does not entirely agree with that primary argument.  Nevertheless, it is clear that Judge Payson did *not* remand the action for a further consideration of Plaintiff's *physical* impairments.  Rather, the Commissioner's original decision rejected Plaintiff's contention that he was physically unable to work (T. 18-23), and Judge Payson left that aspect of the Commissioner's decision intact. (Payson Decision and Order at p. 13: "Petitioner does not contest the Commissioner's findings regarding his physical impairments and anxiety around crowds and strangers, and the Court thus accepts those findings[.]").  Moreover, at the beginning of the second administrative hearing, the ALJ and Plaintiff's counsel agreed that Judge Payson had remanded the matter for a re-consideration of Plaintiff's mental limitations, not his

physical limitations. (T. 345) (Plaintiff's Attorney: "I agree with that. Judge Payson's ruling – Judge Payson's Decision said that the finding – *the physical findings of the Administrative Law Judge would stick*, that we [are] here basically because that [sic] no intellectual evaluation was afforded [sic].") (emphasis added).

Judge Payson did not remand the matter for a completely *de novo* review of Plaintiff's claim. Judge Payson's ruling in that regard is law of the case. Accordingly, Plaintiff's attempt to rely upon Dr. Guo's physical RFC reports to establish disability is unavailing. In any event, the Court does not believe that the ALJ erred by giving Dr. Guo's opinions little weight. As Plaintiff's attorney admitted at second hearing, Guo's reports were obviously inconsistent. Moreover, the more-restrictive of those opinions, upon which Plaintiff relies, is not supported by Guo's own notes or by the record as a whole.

As for Plaintiff's contention that the ALJ failed to follow Judge Payson's remand order, the Court agrees that the Commissioner's decision must be reversed and remanded for additional administrative proceedings, though not for the reason that Plaintiff maintains.

To begin with, the Court finds that both Plaintiff and Defendant are incorrect to assert that Judge Payson remanded the matter solely for a determination of Plaintiff's current IQ score. Despite Judge Payson's statement that "all that would be left for petitioner to meet Listing 12.05(C) is a valid IQ score between 60 and 70," she actually remanded the matter with instructions for the ALJ to obtain *both* IQ testing and "a consultative psychological evaluation to assess petitioner's mental capabilities." The Court understands Judge Payson to have requested a psychological evaluation to

address the issues of Plaintiff's general intellectual functioning and adaptive functioning. If Judge Payson had only wanted Plaintiff's IQ score, she would not have ordered the additional testing. Interpreting Judge Payson's decision as a whole, the Court understands her to have meant that *if* Plaintiff could establish "significantly sub-average general intellectual functioning with deficits in adaptive functioning" initially manifested before age 22, then "all that would be left for [him] to meet Listing 12.05(C) is a valid IQ score between 60 and 70." However, Judge Payson did not actually state that Plaintiff had satisfied the requirements for general intellectual functioning or adaptive functioning under Listing 12.05(C). Rather, she indicated that Plaintiff's school records were evidence of adaptive deficits prior to age 22.

In sum, Judge Payson remanded the matter for a consideration of whether Plaintiff met the general requirements for Listing 12.05 ("significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period") and the IQ portion of sub-section C ("a valid verbal, performance, or full scale IQ of 60 through 70").[9] It appears Judge Payson was satisfied that the "other impairment" portion of sub-section C ("a physical or other mental impairment imposing an additional and significant work-related limitation of function") was satisfied by Plaintiff's severe physical impairments, as found by the ALJ. For all of the foregoing reasons, Plaintiff's contention that the ALJ's decision must be reversed because it failed to comply

_____

[9]The Court's view in this regard happens to coincide with that of Plaintiff's counsel at the administrative hearing. As is clear from counsel's statements to the ALJ, she understood that at the hearing, she needed to prove both the IQ and adaptive functioning elements of Listing 12.05(c). In that regard, counsel argued to the ALJ that she agreed with Dr. Ransom's finding concerning Plaintiff's full-scale IQ score of 68, but disagreed with Ransom's findings regarding a lack of adaptive functioning deficits. (T. 345-346). Obviously, counsel would not have needed to dispute Ransom's determination regarding adaptive functioning if all she needed to do was prove an IQ score between 60 and 70.

with Judge Payson's remand order (by considering evidence other than his IQ score) lacks merit.

Nevertheless, the Court agrees that the matter must be remanded. In that regard, the ALJ clearly found that Plaintiff did not meet the requirements of Listing 12.05(C). Unfortunately, the rationale for that determination is unclear to the Court. On one hand, the ALJ stated that the requirements of sub-section C were not met, "because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." (T. 283). However, that statement on its face appears incorrect, since Plaintiff has a full-scale IQ score of 68, and Judge Payson already found (and it is undisputed in any event) that he also has the requisite "other" physical impairment. Thus, unless there was some reason that the ALJ believed Plaintiff's full-scale IQ score of 68 was invalid, his finding that Plaintiff failed to satisfy sub-section C would be erroneous.

On the other hand, the ALJ also seems to have found that Plaintiff did not satisfy Listing 12.05 generally, insofar as it required "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." In that regard, the ALJ cited to Ransom's report, which found that Plaintiff's adaptive functioning was in the low average range; to Plaintiff's independent activities of daily living; and to the absence of any complaints about adaptive functioning in the medical record. (T. 284). However, while the ALJ's observations on those points find support in the record, it is also undisputed that Plaintiff "has a history of poor school performance," as shown by his placement in special

education classes, his poor grades, his ability to read at only a second-grade level, and his failure to complete high school. Courts have found that such facts may be sufficient to establish "significantly subaverage general intellectual functioning with deficits in adaptive functioning." *See, e.g., Parent o/b/o B.A.K. v. Colvin*, No. 1:14-CV-00519 (MAT), 2017 WL 2470818, at *3 (W.D.N.Y. June 8, 2017) ("[C]ourts have found circumstantial evidence, such as the following, sufficient to infer deficits in adaptive functioning prior to age 22: evidence a claimant attended special education classes; dropped out of school before graduation; or had difficulties in reading, writing, or math. Here, B.A.K. attended special education classes, where she had an individualized education program ("IEP"); thus, plaintiff has established that B.A.K. had the required deficits in adaptive functioning.") (citation omitted). Although the ALJ referred to Plaintiff's history of "poor school performance," he did not expressly explain how it factored into his analysis of Plaintiff's general intellectual functioning and adaptive functioning, if at all.

As the ALJ noted at the beginning of his decision, his task was "to assess the claimant's mental capabilities" in light of his IQ scores and psychological evaluation. (T. 280). Indeed, Judge Payson's remand order was specifically concerned with having the Commissioner obtain IQ testing and psychological testing, and then determine whether Plaintiff satisfied Listing 12.05(C). Unfortunately, the ALJ's decision failed to provide a clear explanation on that point. Accordingly, the Court will remand the matter to the Commissioner for a clearer explanation of the ALJ's determination that Plaintiff does not meet Listing 12.05(C). In that regard, the ALJ should clarify whether he found that Plaintiff does not have "significantly subaverage general intellectual functioning with

deficits in adaptive functioning initially manifested during the developmental period," or whether Plaintiff does not have "a valid verbal, performance, or full scale IQ of 60 through 70," or both, and why.

CONCLUSION

Defendant's cross-motion for judgment on the pleadings [#13] is denied, and Plaintiff's motion for judgment on the pleadings [#11] is granted insofar as this matter is remanded to the Commissioner for clarification of the reason that Plaintiff does not meet Listing 12.05(C). The Court is expressly not remanding the matter for a new *de novo* hearing, or for a reconsideration of Plaintiff's physical impairments. Nor is the Court remanding the matter for the ALJ to revisit steps four and five of the sequential analysis, unless, for some reason, upon remand the ALJ changes his mind about his step three finding. Rather, the Court is remanding the matter for the limited purpose of obtaining clarification of the finding concerning Listing 12.05(C). To the extent that Plaintiff's motion [#11] is based upon anything other than the Commissioner's determination at step three concerning Listing 12.05(C), it is denied.

So Ordered.

Dated: Rochester, New York
     June 13, 2018

                               ENTER:

                               /s/ Charles J. Siragusa
                               CHARLES J. SIRAGUSA
                               United States District Judge